Two Rds. Shared Trust v Wells Fargo Sec., LLC (2024 NY Slip Op 50666(U))

[*1]

Two Rds. Shared Trust v Wells Fargo Sec., LLC

2024 NY Slip Op 50666(U)

Decided on June 5, 2024

Supreme Court, New York County

Reed, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on June 5, 2024
Supreme Court, New York County

Two Roads Shared Trust and LJM Funds Management, Ltd., Plaintiffs,

against
Wells Fargo Securities, LLC, Defendant.

Index No. 650164/2024

Attorneys for Plaintiff:
Patrick J. McGahan of Scott+Scott Attorneys at Law LLP
Patrick J. Rodriguez of Scott+Scott Attorneys at Law LLP
Matthew J. Press of Press Koral LLP

Attorneys for the Defendants:
Christopher Houpt of Mayer Brown LLP

Robert R. Reed, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 38, 39, 40, 41, 42, 43, 48, 49, 50, 51, 53 were read on this motion to DISMISS.
This action arises from defendant Wells Fargo Securities, LLC's handling of plaintiffs' funds immediately after a certain crisis in the futures and options market in February 2018. Plaintiffs Two Roads Shared Trust and LJM Funds Management Ltd. bring four causes of action, two for breach of contract and two for breach of the implied covenant of good faith and fair dealing. In motion sequence number 001, defendant moves pursuant to CPLR 3211 (a) (1) and (a) (7) to dismiss the complaint in its entirety. For the reasons herein, the motion is granted in part.
I. BACKGROUND
Plaintiff Two Roads Shared Trust (Two Roads) is a Delaware statutory trust. The LJM [*2]Preservation and Growth Fund (Fund) is a mutual fund with assets over $773 million as of February 2018, organized as a series of beneficial interests within Two Roads. Plaintiff LJM Funds Management, Ltd. (LFM) served as investment advisor to the Fund until its liquidation during the events at issue here.
LFM's investment strategy centered on the purchase and sale of options on S&P 500 Futures on the Chicago Mercantile Exchange (CME). Activity in the futures market requires the services of futures commission merchants (FCMs), who interface with trading exchanges such as the CME and accept buy or sell orders.
On March 31, 2015, LFM executed a certain Futures and Cleared Swaps Agreement (hereinafter, FCM Agreement) with defendant Wells Fargo Securities (Wells Fargo), contracting for FCM services for the Fund. Wells Fargo would be paid partly on commission.
Section 15 of the FCM Agreement provides that Wells Fargo "shall set its own risk limits for [LFM] which shall be advised to [LFM] from time to time and [LFM] shall comply with all such limits." In addition, the agreement provides that "Wells Fargo shall accept for clearing Derivatives [defined as derivatives products, including futures contracts and options on future contracts] from [LFM] that it regularly accepts for clearing that are within the [Wells Fargo] risk limits." Section 15 also states that "[Wells Fargo] shall have the right, whenever in its reasonable discretion it deems such action necessary or desirable and upon reasonable notice to [LFM], to limit the size of open positions (net or gross) of LFM with respect to the Account and to refuse to accept any orders to establish new positions, whether such refusal, reduction or limitation is required by, or based on position limits imposed under, Applicable Law."
Section 24 of the FCM Agreement entitles either party to terminate the agreement as of right upon written notice. Upon receipt of a notice of termination, LFM is required to close out its open positions or transfer them to another FCM. In addition, Wells Fargo is required to transfer to another FCM identified by LFM all remaining derivative it holds for LFM and distribute them per LFM's instructions, whereupon the agreement terminates.
Section 26 of the agreement states that "[t]here shall be no third-party beneficiaries."
Section 22 contains a limitation of liability clause, stating, "In no event will [Wells Fargo] be liable to [LFM] for consequential, incidental, special or punitive damages."
On February 5, 2018, a serious but short-lived event in the futures and options market occurred, which plaintiffs call "Volmageddon." During the afternoon, the S&P 500 Index options market saw a steep rise in implied volatility—the market's view of the likelihood of future changes in the S&P 500, inferred from options prices. Due to the rise in implied volatility, the Fund's value dropped significantly, but the loss in value was unrealized at this time, as no assets were immediately sold.
In response, LFM sought to reduce its risk by putting itself in a "net short put" position—by buying put options for its investments—consistent with the investment strategy it had followed in the past.
The next morning, around 6:30 a.m., Wells Fargo called LFM and declared the Fund's account and the FCM Agreement "terminated" and declared that it would follow a strategy of immediate liquidation of the Fund's entire portfolio. At this time, Wells Fargo did not transmit a written notice of termination to LFM on behalf of the Fund. According to plaintiffs, Wells Fargo "compelled" LFM's officers to liquidate the Fund and to engage in short sales of E-MINI futures—an asset that LFM did not previously hold or trade in—by explicitly threatening that, if LFM did not do so, Wells Fargo would conduct the trades itself, through its own trading desk, [*3]with less care, and potentially, at even worse prices. Wells Fargo informed LJM it would not execute any transactions for the Fund other than the E-MINI shorts and trades liquidating the Fund's existing positions. Wells Fargo premised its conduct on the provision on the FCM Agreement entitling either party to terminate the contract as of right upon written notice.
At this time, the trades the Fund executed on the afternoon of February 5, 2018 had not yet officially been cleared into the Fund's account with Wells Fargo.
According to plaintiffs, LFM intended to close out the Fund's open positions in an orderly manner or transfer them to another FCM, but it did not have the chance to do so before Wells Fargo forced LFM to trade its open positions into illiquid and mispriced pre-opening markets. Essentially, this locked in the Fund's primarily unrealized losses and made them real.
According to plaintiffs, due to Wells Fargo's actions, they lost the opportunity to trade on and after February 6, 2018 after the markets had normalized following "Volmageddon" and to recover some or all of its net asset value.
Plaintiffs commenced this action on July 18, 2022.

II. DISCUSSION
To succeed on a CPLR 3211 (a) (1) motion to dismiss, defendants have the "burden of showing that the relied-upon documentary evidence 'resolves all factual issues as a matter of law, and conclusively disposes of the plaintiff's claim'" (Fortis Fin. Servs. v Fimat Futures USA, Inc., 290 AD2d 383, 383 [1st Dept 2002], quoting Scadura v Robillard, 256 AD2d 567, 567 [2d Dept 1998]).
On a motion to dismiss under CPLR 3211 (a) (7), the court accepts the facts as alleged in the complaint as true, accords plaintiffs the benefit of any possible favorable inference, and determines only whether the facts as alleged fit within any cognizable legal theory (Leon v Martinez, 84 NY2d 83 [1994]).
1. Breach of Contract
In the first and third causes of action, plaintiffs assert that Wells Fargo breached the FCM Agreement by (1) failing to provide written notice of termination of the Agreement in violation of section 24; (2) refusing to execute any trade requested by LFM on behalf of the Fund in violation of section 24; and (3) failing to give LFM reasonable notice before refusing to accept further trades from LFM other than for the purpose of liquidation, in violation of section 15. The first and third causes of action are essentially identical, except that each is pleaded from the point of view of the two different plaintiffs and plead different damages. Notably, in the third cause of action, LFM seeks to recover management and performance fees lost as a result of Wells Fargo's conduct.
First, defendant seeks to dismiss the first cause of action on the basis that Two Roads, as a non-party to the FCM Agreement, lacks standing to bring the claim. Generally, only the parties to a contract may sue for breach of contract (Parker & Waichman v Napoli, 29 AD3d 396, 399 [1st Dept 2006]). However, an exception lies when one party executes a contract as an agent for a principal (see Aymes v Gateway Demolition Inc., 30 AD3d 196, 196 [1st Dept 2006]). In such circumstances, an undisclosed principal may enforce contracts entered into on their behalf by their agents, except when an agent falsely asserts in the contract that he is the principal (see id.; Simmons v Berkshire Equity, LLC, 149 AD3d 1119 [2d Dept 2017]).
Under the allegations in the complaint, Two Roads may sue as the principal who directed LFM to enter the contract. Although defendant argues that, in the contract, LFM falsely and expressly represents that it is the principal in the transaction, the contract states, "except as [*4]disclosed in writing to [Wells Fargo], [LFM] is acting solely as principal and not as agent for any other party . . ." Thus, the contract allows for an outside writing to inform whether LFM was acting as an agent for Two Roads. Plaintiffs allege that "LFM had disclosed to [Wells Fargo] in writing and orally that the Fund was the account holder under the FCM Agreement . . . and that LFM was acting as the Fund's agent in its capacity as the Fund's appointed investment advisor" (complaint at ¶ 45). In addition, the complaint alleges that the Fund is "organized as a series of the Two Roads serial trust," supporting a reasonable inference that references to the Fund within the contract are equivalent to references to Two Roads (see complaint at ¶ 16). Thus, affording plaintiffs the benefit of favorable inferences at this stage, the allegations support Two Roads' standing to bring this claim as the principal of LFM (see Aymes v Gateway Demolition Inc.).
As to the third cause of action by LFM, defendant argues that the claim is barred by the limitation of liability provision of the FCM Agreement, which bars consequential damages. "A limitation on liability provision in a contract represents the parties' [a]greement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor" (Metro. Life Ins. Co. v Noble Lowndes Intl., 84 NY2d 430, 436 [1994]). However, "an exculpatory agreement, no matter how flat and unqualified its terms, will not exonerate a party from liability . . . [for] willful or grossly negligent acts" (Kalisch-Jarcho, Inc. v New York, 58 NY 377 [1983]).
Here, the FCM Agreement provides that "in no event will Wells Fargo be liable . . . for consequential . . . damages." As an initial matter, here, the fees that LFM would have received from Two Roads for its management of the Fund are consequential damages, as the fees were merely incidental to the FCM agreement, whose purpose was the management of the Fund. The contract itself refutes LFM's characterization that the fees were "the core purpose and end" or "the very essence" of the contract for LFM and Wells Fargo, as it makes no reference to the fees that LFM would receive from Two Roads. As damages that "do not directly flow from the breach," these are consequential damages (see Biotronik A.G. v Conor Medsystems Ireland, Ltd., 22 NY3d 799, 805 [2014]).
However, plaintiffs' allegations sufficiently support an inference that Wells Fargo's conduct may have been willful, reckless, or grossly negligent. If so, despite the apparently comprehensive bar on consequential damages, defendant may not necessarily be exonerated from the claim (see Kalisch-Jarcho). Therefore, it cannot be said that, as a matter of law, the language of the FCM Agreement "conclusively disposes of" LFM's claim for lost fees such that it should be dismissed (Fortis Fin. Servs.).
Defendant also challenges the merits of plaintiffs' breach of contract claims. To this extent, the first and third causes of action can be considered together. To state a cause of action for breach of contract, plaintiff must allege (1) existence of a valid contract, (2) plaintiffs' performance of the contract, (3) defendant's material breach of the contract, and (4) damages (see Noise In The Attic Productions, Inc. v London Records, 10 AD3d 303 [1st Dept 2004]).
Plaintiffs allege that defendant breached section 24 of the FCM Agreement by failing to provide written notice of termination. Plaintiffs allege that, on February 6, 2018 at around 6:30 a.m., George Simonetti, Head of Wells Fargo, contacted LFM's Chief Risk Officer, Arjuna Ariathurai, by phone and stated that Wells Fargo was wholly terminating the parties' business relationship. When LFM's principal, Tony Caine, learned of the termination decision, he immediately called Mr. Simonetti, who confirmed WF's position that it had terminated the entire business relationship and all agreements with LFM. Then, later, Wells Fargo sent formal written [*5]notices to a number of LJM entities at 7:36 a.m., expressly terminating its relationship with them, but not to LFM. Plaintiffs refer to Wells Fargo's statements during these February 6, 2018 calls as "legally invalid oral termination" (complaint at ¶ 69).
The FCM Agreement provides that it "may be terminated at any time by [LFM] or [Wells Fargo] by written notice to the other," creating a mechanism for the end of the contract other than by breach by either party. Section 24 continues to describe the duties of both parties upon receipt of a notice of termination, and specifically provides that Wells Fargo must takes certain actions "whereupon this Agreement shall terminate." Under these terms, however, the failure to provide such notice does not constitute breach—rather, it renders Wells Fargo's purported termination ineffective.
As such, Wells Fargo's alleged refusal to allow LFM to close out its open positions also cannot constitute breach. Section 24 provides that, "[i]n the event of a notice terminating this Agreement, [LFM] shall either close out open positions in the Account or arrange for such open positions to be transferred to another FCM promptly." As Wells Fargo did not send the written notice required to initiate the termination process and procedure, the terms of section 24 simply do not apply.
At oral argument on this motion, plaintiff's counsel represented that, to his knowledge, Wells Fargo followed up on its calls on the morning of February 6, 2018 with an email expressing its intent to terminate the Agreement. Indeed, it appears from the decision of the District Court for the Southern District of New York that plaintiff alleged that Wells Fargo sent a termination letter in the parallel federal lawsuit (see Wells Fargo Sec., LLC v LJM Inv. Fund, L.P., US Dist Ct, SD NY, 18 CV 2020, *2, Swain, J., 2021). However, as there are no allegations in the complaint here or any evidence in the record regarding any such email, no such written notice is properly before the court for its consideration.
Next, as to Wells Fargo's alleged failure to advise LFM of any risk of exceeding an internal Wells Fargo "IML" limit, section 15 provides that Wells Fargo shall advise LFM "from time to time" of its own risk limits for LFM. Plaintiffs allege that "[p]rior to February 6, 2018, [Wells Fargo] . . . failed to advise LFM of any hard internal risk limits related to the Fund" (complaint at ¶ 50). Plaintiffs sufficiently allege a breach to this extent.
Plaintiffs also allege that Wells Fargo breached section 15 by refusing to accept further trades. Section 15 provides that "[Wells Fargo] shall accept for clearing Derivatives from [LFM] that it regularly accepts for clearing that are within the [Wells Fargo] risk limits." On the other hand, as noted above, it also gives Wells Fargo discretion to limit investments and refuse certain positions. According to the complaint, "[Wells Fargo] informed LFM that it would not execute any transactions for the Fund other than the E-MINI shorts and trades liquidating the Fund's existing position" (complaint at ¶¶ 8, 14). Plaintiffs allege that, on February 6, 2018, Wells Fargo refused to accept any further trades from LFM other than for the purpose of liquidation, and forcibly "foisted on LFM" trades of E-MINI futures. As to Wells Fargo's refusal to accept further trades other than those liquidating the Fund's existing position and purchasing E-MINI shorts, plaintiffs' allegations do not support a breach of contract. First, plaintiffs' do not allege that they made any trade requests that defendant refused. Defendant only stated that it would refuse any such requests by LFM if they were inconsistent with its strategy of liquidation and performing E-MINI shorts. As for the allegations that Wells Fargo "foist[ed]" trades of E-MINI futures on LFM, plaintiffs admit that they purchased the E-MINIs themselves—albeit unwillingly. If Wells Fargo committed any wrongdoing in this regard, such conduct does not [*6]constitute a breach of contract claim here, as there are no contract terms that plaintiffs allege Wells Fargo violated. Accordingly, this portion of the breach of contract claims must be dismissed.
2. Breach of the Implied Covenant of Good Faith and Fair Dealing
In the second and fourth causes of action, plaintiffs assert that defendant breached the implied covenant of good faith and fair dealing by preventing LFM from closing out the Fund's positions free from defendant's coercion or undue influence.
"All contracts contain an implied covenant of good faith and fair dealing" (AEA Middle Mkt. Debt Funding LLC v Marblegate Asset Mgt., LLC, 214 AD3d 111, 132 [1st Dept 2023]). It is well established, however, that, "[w]here a cause of action for breach of the implied covenant of good faith and fair dealing is based on the same operative facts and seeks the same damages as a cause of action for breach of contract, the good faith claim is duplicative and should be dismissed" (id. at 132-133). Indeed, such a claim cannot survive where "there is an express contract addressing the issue in dispute" (Cambridge Capital Real Estate Invs., LLC v Archstone Enter. LP, 137 AD3d 593, 595 [1st Dept 2016]).
Here, the allegations comprising plaintiffs' good faith claims are virtually identical to those underlying the accompanying breach of contract claim—indeed, plaintiffs repeatedly cite provisions of the FCM Agreement in support of the good faith claims—and the relief sought is also identical. Plaintiffs do not allege that Wells Fargo committed any wrong independent of the alleged breach of contract. Furthermore, the parties have set forth their terms for Wells Fargo's processing of trades on behalf of LFM and either party's termination of the agreement in sections 15 and 24. An implied covenant claim would be inconsonant with the express provisions of the parties' contract (see Cambridge Capital Real Estate Invs., LLC).
Accordingly, it is hereby
ORDERED that the motion is granted in part, to the limited extent that the following claims are dismissed:
1. The parts of the first and third causes of action relating to (1) defendant's failure to provide written notice of termination of the FCM Agreement in breach of section 24, (2) defendant's refusal to allow LFM to close out its open positions according to the procedures set forth in section 24, and (3) defendant's refusal to accept further trades other than for the purpose of liquidation or trading of E-MINI futures in violation of section 15; and
2. The second and fourth causes of action; and it is further
ORDERED that the motion is, in all other respects, denied, with the court observing that parts of the first and third causes of action that assert that Wells Fargo failed to give notice regarding its internal limits survive the motion.
DATE June 5, 2024
ROBERT R. REED, J.S.C.